**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ZK ENPACHI FOUNDATION, a Cayman Islands foundation company; FENNARIO CAPITAL LLC, a Delaware limited liability company; NEON DIGITAL HOLDING FZC LLC, a United Arab Emirates free zone company; SCOTT DE TABOADA, an individual; ANDREW MARCHIONE, an individual; YONATON MELNICK, an individual; and DANIEL HAMZA, an individual,

Plaintiffs,

v.

CHRISTOPHER CASHWELL, an individual; and UP ONLY INC. d/b/a LOOT LABS, a Delaware corporation,

Defendants.

Case No. 2:26-cv-14958

**COMPLAINT FOR:**

**(1) VIOLATION OF SECURITIES EXCHANGE ACT § 10(b) AND RULE 10b-5; CONTROL-PERSON LIABILITY UNDER § 20(a);**
**(2) VIOLATION OF THE NEW JERSEY UNIFORM SECURITIES LAW (N.J. Stat. Ann. § 49:3-71);**
**(3) COMMON-LAW FRAUD / FRAUDULENT INDUCEMENT;**
**(4) CONVERSION;**
**(5) EQUITABLE REMEDIES: CONSTRUCTIVE TRUST, EQUITABLE LIEN, ACCOUNTING, AND DISGORGEMENT;**
**(6) UNJUST ENRICHMENT (IN THE ALTERNATIVE);**
**(7) RACKETEERING (N.J. Stat. Ann. § 2C:41-2(c))**

**JURY TRIAL DEMANDED**

## COMPLAINT

Under Local Civil Rule 10.1(a), the parties' addresses are: Plaintiff ZK Enpachi Foundation, 3rd Floor, Genesis Building, Genesis Close, George Town, P.O. Box 10035, KY1-1001, Cayman Islands; Plaintiff Fennario Capital LLC, 16192 Coastal Highway, Lewes, Delaware 19958; Plaintiff Neon Digital Holding FZC LLC, BLB-635-AMC Boulevard, B Building, Ajman, United Arab Emirates; Plaintiff Scott De Taboada, Los Angeles, California;[1] Plaintiff Andrew Marchione, 1511 Avenida Ponce de León, San Juan, Puerto Rico 00909; Plaintiff Yonaton Melnick, Brooklyn, New York; Plaintiff Daniel Hamza, 1033 Main Street, Norwell, Massachusetts 02061; Defendant Christopher Cashwell, on information and belief based on public-records address data, 260 Loudville Road, Easthampton, Massachusetts 01027; and Defendant Up Only Inc., on information and belief based on the address it gives in its SAFEs, 14 Wall Street, 20th Floor, New York, New York 10005.[2]

## I. INTRODUCTION

1. Christopher Cashwell raised investors' money to build a company. While the raise was still open, he worked out how to take that money as a "loan" to himself and trade it for his own account, and he put the plan in writing.

2. Cashwell supplied the pitch, and his co-founder, Henry Felella, carried it to investors: Loot Labs was a Telegram-first venture studio, its exchange was "already almost done," and it had already raised $1.5 million from friends and family. The exchange never launched. The

[1] De Taboada's and Melnick's street addresses cannot be provided at this time. Each has been the target of phishing attacks, and Melnick has also received threats; placing their home addresses on the public docket would expose them to further risk. Plaintiffs will provide both addresses to the Court under seal on request.

[2] Less than a month after Cashwell moved the capital out of the treasury (¶¶ 76–79), he conceded that development had stopped (¶ 85), and every officer other than Cashwell has departed (¶ 96). Cashwell ran Up Only from his home in Hopewell, New Jersey (¶ 15), where he no longer resides (¶ 13). On information and belief, Up Only no longer operates as a going concern and has no principal place of business from which it operates, though the Delaware Division of Corporations still lists it as a corporation. The address given is the one Up Only stated in its SAFEs.

whole raise brought in approximately $570,000, and $275,000 of it came from the seven investors who bring this action.

3. On September 27, 2024, with investor money already in the Company's treasury, Cashwell wrote to Felella that "[t]he easiest way to avoid gains is to do it as a loan to me and let me trade under my trader status." Then he kept taking investors' money.

4. Cashwell designated a personal wallet he called "a freshie generated from the same master as my loot multisig signer," meaning the master behind his own signing key on the Company's treasury. Asked for his trading entity, he named five entities, then gave Felella a sixth name to record the trading under, "Celestial Technology LLC," and wrote that "i think loan is the best way."

5. Cashwell traded the investors' capital and boasted of "8 figure nw growth in the past month." When Felella asked him to return it, he refused: "I'm gonna print some more before reverting capital."

6. On February 5, 2025, Cashwell received a written demand from an investor's lawyer. He answered with a threat to Felella, whom he blamed for the demand: "I promise you can't afford to have this get bigger." The next morning, approving the transfer with his own two keys and no other, he moved approximately $255,600 out of the treasury that held the investors' capital and into his personal wallet.

7. Less than a month after the transfer, Cashwell told the investors the Company had ">36 months of operational runway." To one who asked for his money back, he wrote that "I haven't refused anyone anything." He had already told Felella that investors had "zero right" to a refund, under a term found nowhere in the agreements.

8. Cashwell never built the studio and never returned the money. He took an engineering job at Uniswap Labs instead. He must restore what he took and give up what he made with it, and he must answer in treble damages under New Jersey's racketeering law and in punitive damages for the deliberate fraud behind it.

## II. PARTIES

9. Plaintiff **ZK Enpachi Foundation** ("**ZK Enpachi**") is a foundation company organized under the laws of the Cayman Islands. ZK Enpachi invested $100,000 in Up Only Inc. through the transaction described below.

10. Plaintiff **Fennario Capital LLC** ("**Fennario**") is a limited liability company organized under the laws of the State of Delaware. Fennario invested $10,000 in Up Only Inc. through the transaction described below.

11. Plaintiff **Neon Digital Holding FZC LLC** ("**Neon**") is a free zone company organized under the laws of the United Arab Emirates. Neon invested $25,000 in Up Only Inc. through the transaction described below.

12. Plaintiffs **Scott De Taboada**, **Andrew Marchione**, **Yonaton Melnick**, who goes by Jack Melnick, and **Daniel Hamza** are individuals. Each invested in Up Only Inc. through the same Loot Labs SAFE and Token Warrant transaction described below: De Taboada invested $50,000, Marchione invested $50,000, Melnick invested $35,000 across two SAFEs, and Hamza invested $5,000. This Complaint refers to ZK Enpachi, Fennario, Neon, De Taboada, Marchione, Melnick, and Hamza collectively as "**Plaintiffs**."

13. Defendant **Christopher Cashwell** ("**Cashwell**") is an individual who, on information and belief based on public-records address data, resides at 260 Loudville Road, Easthampton, Massachusetts 01027. Until in or about 2025, he resided at 111 East Prospect Street, Hopewell, New Jersey 08525. Cashwell founded, and at all relevant times dominated and controlled, Up Only Inc., and he is the officer and director who made, directed, or authorized each act alleged below. On the Telegram messaging platform, where the conduct alleged below substantially unfolded, Cashwell appeared under the name "poppa." His public LinkedIn profile lists, under "Licenses & certifications," the Securities Industry Essentials, the Series 3, and the Series 63, each attributed to FINRA.

14. Defendant **Up Only Inc.** ("**Up Only**" or the "**Company**"), doing business as **Loot Labs** ("**Loot Labs**"), is a corporation organized under the laws of the State of Delaware. At all relevant times Cashwell was Up Only's controlling shareholder, officer, and director, and used the

Company as the instrumentality through which he carried out the conduct alleged below. This Complaint refers to Cashwell and Up Only collectively as "**Defendants**."

15. Cashwell lived at his house in Hopewell, New Jersey throughout the raise and when he moved the money out of the treasury, and he ran Up Only from there. From New Jersey, he used the Company to sell its securities to investors and to take their money into a treasury on which he held a signing key. That business affected trade and commerce in New Jersey.

## III. JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the First Cause of Action arises under the federal securities laws—section 10(b) of the Securities Exchange Act of 1934 (the "**Exchange Act**"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

17. This Court has supplemental jurisdiction over the state-law causes of action under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the First Cause of Action.

18. This Court has personal jurisdiction over Cashwell because he committed the acts alleged below while residing in this District and directed them at investors from here, and because, in this action to enforce liabilities created by the Exchange Act, section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), provides that process "may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found"; and over Up Only because Cashwell directed its affairs from this District.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred here.

## IV. FACTUAL ALLEGATIONS

### *A. Up Only Solicits Investment on Claims of a Near-Finished Exchange and Capital Already Raised*

20. In the late summer and fall of 2024, Up Only raised money under the name Loot Labs, holding itself out as a Telegram-first blockchain venture studio. Henry Felella ("**Felella**"),

the Company's co-founder and Chief Executive Officer, made the pitches, and Cashwell supplied what Felella told investors about the product, the build, and the Telegram handles.

21. The pitch centered on a portfolio of valuable Telegram handles and a venture-studio thesis built on the TON blockchain. Investor capital, Felella told investors, would fund the building of that studio.

22. In late August 2024, Felella relayed to Melnick over Telegram that the Company's @crypto exchange was nearly finished—"FE & BE development is already almost done for it"—and that "we have 1.5M raised from F&F."

23. A written summary Felella forwarded to prospective investors stated that "Loot Labs is raising a $5M seed round at $75M pre-money valuation" with "$2M+ committed so far from angels."

24. In or about September 2024, around the time Melnick invested, Cashwell met Melnick in person and described the Telegram handles he said he owned and the development work he said he had done.

25. On information and belief, the handles at the center of the pitch were not Cashwell's: they belonged to his business partner "JF," who posted from the @crypto handle. A Company fundraising plan from September 2024 refers to "the agreement between JF and Chris," and on September 27, 2024, Cashwell wrote to Felella that "in no scenario do we pay jf $5m."

26. On September 28, 2024, Cashwell drafted a raise update announcing that the Company had "added the co-founder of TON Society and former TON Foundation CMO to the team & cap table, alongside angels" and "partners from funds like Paper Ventures," and claiming "our current runway (~18mos)." He forwarded it to Felella.

27. Felella, a friend of Melnick's, pitched him in person and on Telegram in late August 2024. The pitch rested on Telegram handles it said Cashwell owned and an exchange Cashwell had been building. Melnick executed SAFEs on September 26 and October 4, 2024 and invested $35,000.

28. Felella pitched Marchione much as he pitched the other investors, on the value of the Telegram handles and how the Company would use them to drive activity. Marchione executed his SAFE on September 26, 2024 and invested $50,000.

29. Felella first pitched ZK Enpachi and Fennario in person in Singapore on September 18 and 19, 2024, at TOKEN2049. He told them the Company could acquire Telegram handles, such as “casino” and “wager,” for games on the TON blockchain, and that the money raised would fund those games and the handles. Up Only presented the round to ZK Enpachi as a $5 million raise with $2.2 million already committed.

30. ZK Enpachi executed its SAFE on September 27, 2024 and invested $100,000. It never dealt with Cashwell before investing.

31. Fennario never dealt with Cashwell before it executed its SAFE on October 2, 2024 and invested $10,000.

32. Melnick introduced De Taboada to the Company. Felella then pitched De Taboada by phone and on Telegram, in or about September 2024, much as he had pitched Melnick, passing along the promises Cashwell had made him about the venture. De Taboada executed his SAFE on October 3, 2024 and invested $50,000.

33. Up Only solicited Neon with the same representations about the studio, the Telegram handle portfolio, the near-finished exchange, and the capital already raised. Neon executed its SAFE on October 23, 2024 and invested $25,000.

34. Felella introduced Hamza to the Company in a large group chat of prospective investors, gave him the Company’s information, and forwarded him the written summary quoted above. Two or three members of the Loot Labs team then pitched Hamza in depth on a video call. Hamza executed his SAFE on November 20, 2024 and invested $5,000.

***B. Up Only Sells Plaintiffs $275,000 of SAFEs on a Pitch That Was False***

35. Up Only sold the investments on a Simple Agreement for Future Equity bundled with a Token Warrant (together, the “**SAFE**”), issued at a $50,000,000 pre-money valuation cap. Up Only titled the SAFE “Loot Labs SAFE + Token Warrant” and sent it for signature from the address coordinator@crypto.tg.

36. In reliance on the representations set out above, ZK Enpachi invested $100,000, Fennario invested $10,000, Neon invested $25,000, De Taboada invested $50,000, Marchione invested $50,000, Melnick invested $35,000, and Hamza invested $5,000—$275,000 in all among the Plaintiffs.

37. Plaintiffs' capital reached the Company's treasury multisig (the "**treasury**"), as the Ethereum blockchain records: Marchione's $50,000 on September 26, 2024; ZK Enpachi's $100,000 on October 1; Fennario's $10,000 on October 2; Melnick's $20,000 on October 3; De Taboada's $50,000 and Melnick's $15,000 on October 4; Neon's $25,000 on October 29; and Hamza's $5,000 on November 20.

38. In all, Up Only raised approximately $570,000 from the investors Cashwell solicited between approximately August and November 2024.

39. Other investors bought the same SAFE, with the same Token Warrant, in the same weeks. On September 30, 2024, one individual executed a $3,000 SAFE and still other investors paid in $15,000. Others paid in $50,000 on October 17. QIE Pte. Ltd. executed a $30,000 SAFE on November 12, 2024, and 30,000 USDT reached the treasury two days later.

40. Up Only did not have "$2M+ committed so far from angels" or the $2.2 million in commitments it presented to ZK Enpachi, and it had not raised $1.5 million from friends and family. The entire raise, from every investor, brought in approximately $570,000, less than half of what the pitch said friends and family alone had already supplied.

41. The exchange the pitch called "already almost done" in August 2024 never launched.

### *C. Cashwell Structures the Diversion While the Raise Is Open*

42. On September 27, 2024, while the raise was still open, Cashwell proposed in writing to take part of the treasury, which by then held Marchione's $50,000, as a personal "loan" and trade it: "The easiest way to avoid gains is to do it as a loan to me and let me trade under my trader status[.] . . . Then I reallocate to the company[,] [a]s owner capital addition."

43. Felella took part in that exchange. He asked how to "eliminate cap gains issues for Loot if you trade with a sliver of treasury," proposed to "have you trade and then return principle," and answered Cashwell's loan proposal: "kek that works."

44. In the weeks that followed, as Cashwell kept selling, Fennario, De Taboada, Neon, and Hamza executed their SAFEs, Melnick executed his second, and each paid in its money.

***D. Cashwell Builds a Personal Conduit From His Own Treasury Signing Key***

45. Cashwell designated a personal Ethereum wallet and told Felella it was "a freshie generated from the same master as my loot multisig signer"—that is, an address derived from the same master key as the signer he used for the treasury. He identified that wallet as 0xB6D6831E9e7E2A16AF64D118A25B42Ac0169ce92 and labeled it "@poppa HW2" (the "**HW2 wallet**").

46. Cashwell also set up another wallet—0x42886cBd8080a175f758C03D74f23615510Eb52C—as what he called a "distro point," telling Felella "it won't actually end up being traded from this wallet, it's just a distro point, but you can put it down as that much at least."

47. Asked by Felella for the incorporated name of his trading entity, Cashwell listed five entities, among them "Ebisu Securities Inc (SEC-registered US entity)" and "Aureus Fund PCC Limited (Gibraltar-based hedge fund)."

48. When Felella said he needed the SEC registered name, to record the trading in a spreadsheet tracking money flow, Cashwell gave one that was not among the five: "in that case just put it as Celestial Technology LLC."

49. Cashwell explained that "we don't really want to go thru the trading entity legally speaking," because "fees would be not fun and also returns are different because of investment policy standards."

50. When Felella said he had put it down as a loan, Cashwell wrote that going "into the fund, that's aureus," would mean "Gibraltar-mandated min lockups" and "more paperwork than anyone wants," and concluded, "i think loan is the best way." He then described how the money would come back to the Company—"then i can repay + 'add owner-contributed capital.'"

51. A minute later, Cashwell stated the choice: “truthfully i could straight up trade off the balance sheet and that’d be fine, but it’s muddier that way,” and settled it: “better to segregate imo.”

52. On October 2, 2024—the same day Fennario executed its SAFE—Cashwell’s signing key initiated a transfer of $50,000 in USDC out of the treasury (0xb9e430FCE908AC3Adac7b02D718886924e5f0caA) to the “distro point” wallet he controlled, and the treasury’s second required signature completed it.

53. On October 30, 2024, Cashwell’s signing key initiated another transfer of 18,500 USDT from the treasury to the HW2 wallet, and the treasury’s second required signature completed it. That same day, the HW2 wallet sent the same amount to another address; 38 minutes later, the funds moved on to a wallet that a public blockchain explorer labels a KuCoin hot wallet.

54. Between those two treasury transfers, on October 10, 2024, the treasury sent 16,802 USDC to a third wallet (0xc6ef0Dd85846D0CE5Db970d8a1148AEc60d62aA2), which five days later sent 15,994 USDC on to the same “distro point” wallet. On February 9, 2025, the HW2 wallet sent the third wallet 15,755 USDC.

***E. Cashwell, Overdrawn at Home, Boasts of an Eight-Figure Month***

55. On October 16, 2024, Cashwell told Felella that “we have a shared bank account that ends up negative fairly often because i don’t have any recurring income,” and that “we get overdrafts literally all the time.” In the same exchange he added that he had “lost $1.4 million this year by holding equities.”

56. The same day, Cashwell’s wife, Emily Cashwell, told Felella that the couple’s bank “account keeps going negative” and that they were “missing mortgage and other important payments.”

57. The mortgage they were missing payments on secured 111 East Prospect Street, Hopewell, New Jersey, which Cashwell had bought in 2021 for $4,200,000 and financed with a $2,940,000 mortgage, recorded in Mercer County on October 25, 2021. The residence runs 6,542 square feet on roughly forty-three acres.

58. On November 23, 2024, Cashwell boasted to Felella: "I've had 8 figure nw growth in the past month, the amount of fucks left in my tank is zero."

59. Cashwell kept neither the mortgage nor his other debts current. In June 2025, a lis pendens recorded in Mercer County gave notice of a foreclosure action against the house, and creditors sued Cashwell at that address in the Mercer County courts on October 27, 2025 and February 16, 2026.

### *F. Cashwell Admits There Is No Settled Product, Then Refuses to Return the Capital*

60. On December 17, 2024, Cashwell admitted that "we barely had alignment on what the product even is" and that "we were redefining it literally a week ago."

61. That month, as the two wound the venture down, Felella asked Cashwell to return the investors' capital to the Company.

62. Cashwell refused, and said why: "No, if we're unwinding I'm gonna print some more before reverting capital. No sense in it being a full waste, and I'm not really excited about paying more out of pocket at this point. I think the funds roll until early new year."

63. Cashwell added: "You don't need to rush the refund process anyway, it's not as simple as just sending people usdc."

64. Cashwell wrote that "the funds were a loan to me, and the disposition of it is my personal perogative," and when Felella pointed to messages describing a trading account for the Company, Cashwell replied that it was "MY trading account."

65. In another exchange with Felella, Cashwell disclosed that he was "party to a FinCEN investigation" and that his "main bank account is frozen."

66. In the same exchange, resisting a transfer of funds back to the Company, Cashwell wrote that if "it comes out later that it was part of a trading account i've had personal control over," he did not "want to have any weirdness there," because "regulators are fucking overreachers and will grab at straws if they can."

67. Celebrating a trading position with Felella, Cashwell wrote that "I will just book it as revenue and then increase the valuation."

### *G. Cashwell Invents a SAFE Term That Does Not Exist*

68. On January 8, 2025, Cashwell told Felella: "Investors have zero right and we have zero obligation to entertain any request for refund. It's exclusively our decision for the next two years, as laid out in the SAFE+T."

69. No such provision exists. The SAFE, Token Warrant included, does not make refund requests "exclusively our decision for the next two years," and no term of it strips investors of the right to seek return of their capital.

### *H. Cashwell Answers the Demand With Threats, Then Moves the Money*

70. On the night of February 1, 2025, Cashwell's signing key approved a change to the treasury that would add the HW2 wallet as an owner.

71. On February 5, 2025, Plaintiff ZK Enpachi, through prior counsel, sent Cashwell a written demand for the return of its investment.

72. That same day, Cashwell told Felella on Telegram that "I just received a demand letter from one of your people's lawyers indicating that you've stated to that person that I fraudulently misled you and/or investors."

73. Cashwell answered the demand by threatening Felella: "This is your one and only warning to retract any kind of statements you've made indicating that I have acted fraudulently in any manner," and "I promise you can't afford to have this get bigger."

74. Cashwell also warned that he would "deliver . . . a formal C&D letter," and asserted that Felella's failure to complete certain "offboarding actions" "constitutes impoundment of corporate assets, and the company will file suit for that should you fail to comply by end of day today."

75. Cashwell told Felella that "your investor friend is not entitled to make a demand for repayment," and claimed he "had consent of the other officer to act in the way I did."

76. At 10:29 a.m. Eastern the next morning, February 6, 2025, the treasury added the HW2 wallet as an owner.

77. Minutes later, Cashwell's two keys alone—his signing key and the HW2 wallet—approved a single transfer of approximately $255,600 out of the treasury: 219,107.99 USDC, 36,500 USDT, and a fraction of an ETH.

78. The transfer executed at 10:55 a.m. Eastern (15:55:23 UTC; block 21788494; transaction hash 0x9e4ce069df2de2af4edbaa5aaf4e7d96e3da8e0440c53a46af4383e2ed0b9afe), as the public Ethereum blockchain permanently records.

79. Cashwell moved the money into the HW2 wallet, the one he had described as generated from "the same master as my loot multisig signer."

***I. Cashwell Reassures Investors While Holding Their Money***

80. On February 7, 2025, De Taboada, who had heard that Felella had stepped down, asked Cashwell on Telegram for an update. Cashwell answered that "the @crypto product we were going to launch is a non-starter due to recent changes in tg miniapp policies."

81. Cashwell added that Felella's leaving had "zero impact whatsoever" and that, "in terms of net value creation," he was "the one who actually conceptualizes, designs, and develops literally all of the stuff that we do."

82. De Taboada told Cashwell that he had put $50,000 into the Company "and seems like a lot is changing." Cashwell wrote back that he was "planning to lower the round valuation by ~half to account for the impact, and for transparency i am also contributing more to the company personally." The day before, he had moved approximately $255,600 out of the treasury and into his HW2 wallet.

83. In or about February 2025, Cashwell went to work for someone else, as a Staff Protocol Engineer at Uniswap Labs.

84. On March 4, 2025, Cashwell sent the Company's investors, among them Plaintiffs Hamza and De Taboada, a written "TLDR update" over Telegram. It announced that Felella "has resigned as CEO" and that "in the interim Chris has assumed the role to ensure continuity."

85. Under the heading "The Ugly Stuff," Cashwell conceded that development of what the investors had funded had stopped, writing that "[d]ue to changes in Telegram policies, we've halted development of blockchain-native apps on Telegram"—the Telegram-first blockchain

venture studio he had sold—and describing some of what Up Only had built as "existing, partially complete products."

86. The update described a company in sound health: "We've been operating *extremely efficiently*, with current revenue exceeding monthly liabilities. As of now, the company has >36 months of operational runway, and we expect this to only improve from here. Up Only, as it were."

87. The update told investors where the surplus was going: "We're currently allocating the excess to cover anticipated expenses in connection with planned product launches."

88. On April 23, 2025, De Taboada wrote to Cashwell that the product had changed, that his point of contact at the Company had left, and that other investors "are being refused their funds after asking to get them back." He asked Cashwell to "return my funds due to all the company changes."

89. Cashwell answered that "Telegram is our investor communication channel," that "I haven't refused anyone anything," and that "we can't selectively unwind investors."

90. Instead of a refund, Cashwell offered De Taboada two "reasonable paths": a private sale of his position to other investors, or waiting "until the company is sufficiently capitalized to buyback directly."

91. When De Taboada asked, "why not just wind it down and return all the money then?" Cashwell answered: "Because right now a bit over 25% of the funds have been spent and doing so would mean I come out of pocket like $150k."

92. In the same exchange, Cashwell wrote that he had "literally turned down 7 figs of contract dev roles because I'm dedicated to giving it the most I can." He had gone to work at Uniswap Labs in or about February 2025.

### *J. Cashwell Refuses the Investors' Demands and Denies He Traded Their Funds*

93. After ZK Enpachi's February 5 demand, Cashwell told it he was not planning to return investor capital. From March through July 2025, other investors, among them De Taboada, repeatedly demanded the return of their capital, and Cashwell refused or ignored each demand.

94. On August 7, 2025, De Taboada paid 100 Telegram Stars to send Cashwell a formal demand for the return of his investment. Cashwell never answered.

95. Cashwell later told Melnick: "I can't believe you honestly think I traded with and lost investor funds. I'd literally never do that." In fact, Cashwell had traded the investors' capital, as his messages to Felella show.

96. Every officer of the Company other than Cashwell has departed. Cashwell never built the studio he sold and never returned the investors' capital.

**FIRST CAUSE OF ACTION**

**(Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5; Control-Person Liability Under Section 20(a))**

**(Against All Defendants)**

97. Plaintiffs incorporate each preceding and subsequent paragraph as though fully alleged herein.

98. Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, in connection with the purchase or sale of any security, to employ any device, scheme, or artifice to defraud; to make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person. Defendants violated each.

99. The SAFE is an investment contract, and so a security under section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10). Plaintiffs paid $275,000 into a common enterprise, the Loot Labs venture studio Cashwell held out as the use of their capital, expecting profits from the entrepreneurial and managerial efforts of Cashwell and Up Only. (¶¶ 20–21, 35–36.)

100. Up Only, through its Chief Executive Officer, and Cashwell, who supplied the pitch and told Melnick himself of the handles and the development work, represented that Loot Labs was a Telegram-first venture studio resting on a portfolio of valuable Telegram handles, that investor capital would build it, that its exchange was "already almost done," that it had "1.5M raised from F&F," and that it had "$2M+ committed so far from angels." (¶¶ 20–34.)

101. Each of those statements of present fact was false when made: the whole raise brought in approximately $570,000, the exchange never launched, and, on information and belief, the handles were not Cashwell's. (¶¶ 25, 40–41.) There was no settled product to build, as Cashwell admitted on December 17, 2024. (¶ 60.)

102. As to every sale after September 27, 2024, the promise about the use of the capital was false too. That day Cashwell proposed in writing to take part of the treasury as a personal "loan" and trade it as his own, and Defendants never told those buyers of that plan. (¶¶ 42–44.)

103. Each misstated and omitted fact was material to a reasonable investor deciding whether to fund a venture studio, who would want to know that its build, its raise, and its handles were not what the pitch said, and that its founder meant to trade part of the capital for his own account.

104. As founder, controlling shareholder, and a signer on the treasury, Cashwell knew what Up Only had raised and built, and so knew the pitch was false. (¶¶ 13–15, 45.) And on September 27, 2024, he wrote out the plan. (¶ 42.)

105. Cashwell designed the arrangement with care and kept it from the investors, routing the funds through the HW2 wallet, derived from his treasury signing key, and through a "distro point," and giving Felella a name to book the trading under that was not among the five entities he had listed. (¶¶ 45–53, 109.)

106. Cashwell knew the plan would not survive scrutiny: if he moved the funds "to the business and it comes out later that it was part of a trading account i've had personal control over," then, as he put it, "regulators are fucking overreachers and will grab at straws if they can." (¶ 66.) He holds himself out as a securities professional (¶ 13), and he later denied to Melnick that he had "traded with and lost investor funds," saying he would "literally never do that" (¶ 95).

107. Cashwell's motive was acute because his household account "ends up negative fairly often," he had lost "$1.4 million this year" on equities, and the couple was "missing mortgage and other important payments." (¶¶ 55–56.) And he readied the taking: four days before ZK Enpachi's demand, he approved adding his HW2 wallet as a treasury owner, and the morning after it he moved approximately $255,600 into that wallet. (¶¶ 70–79.)

108. Defendants made the misrepresentations to induce Plaintiffs to buy the SAFE, and they did. Each Plaintiff heard the pitch before investing from Up Only's Chief Executive Officer or its team, and Melnick heard of the handles and the development work from Cashwell too. (¶¶ 24, 27–36.) Had Plaintiffs known the truth, none would have invested.

109. Plaintiffs' reliance was reasonable: the SAFE was a formal investment instrument sent for signature, and the truth lived only in Cashwell's private messages, the only record that identified the "distro point" and HW2 wallets as his. (¶¶ 35, 42–54.)

110. Each Plaintiff lost the whole of what it paid for the SAFE: ZK Enpachi $100,000; Fennario $10,000; Neon $25,000; De Taboada $50,000; Marchione $50,000; Melnick $35,000; and Hamza $5,000, or $275,000 in all (¶¶ 36–37). None has received equity, tokens, or any other income on the SAFE, and Defendants have returned nothing (¶ 96).

111. Plaintiffs' loss flowed from the truth the pitch hid: there was no settled product, and Cashwell never built the studio. Instead, he moved the capital Plaintiffs had paid into the treasury to wallets he controlled, and none of it came back. (¶¶ 52–53, 60, 76–79, 96.)

112. Up Only is liable as a primary violator because the pitch its Chief Executive Officer delivered was Up Only's statement, over which it had ultimate authority, and its scienter is Cashwell's. (¶¶ 20–26.)

113. Cashwell is liable as a primary violator for what he told Melnick himself (¶¶ 24–25), and under Rule 10b-5(a) and (c) for the scheme he ran: he supplied the pitch, designed the sham "loan," built the HW2 wallet, chose the name to book the trading under, and moved the capital to himself. (¶¶ 20–26, 42–54, 62, 64, 76–79.)

114. Cashwell is also liable under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). As Up Only's founder, controlling shareholder, officer, and director, he controlled Up Only and culpably participated in its violation. (¶¶ 13–14.)

115. Defendants are jointly and severally liable to each Plaintiff for the amount it lost (¶ 110), or, at its election, for rescission of its SAFE and return of what it paid, on the tender of its SAFE pleaded in paragraph 126, with pre-judgment interest as allowed by law.

**SECOND CAUSE OF ACTION**

**(Violation of the New Jersey Uniform Securities Law—N.J. Stat. Ann. § 49:3-71)**

**(Against All Defendants)**

116. Plaintiffs incorporate each preceding and subsequent paragraph as though fully alleged herein.

117. The SAFE, its Token Warrant included (¶ 35), is a "security" under N.J. Stat. Ann. § 49:3-49(m), for the reasons pleaded in paragraph 99. Each Plaintiff is a "[p]erson" under § 49:3-49(i). (¶¶ 9–12, 35.)

118. Up Only and Cashwell offered and sold the SAFE by means of the untrue statements and omissions of material fact pleaded in paragraphs 100 through 103, Plaintiffs not knowing of the untruth or omission, in violation of N.J. Stat. Ann. § 49:3-71(a)(2).

119. As to every sale after September 27, 2024, they also sold it "by employing any device, scheme, or artifice to defraud" and by a "course of business which operates or would operate as a fraud or deceit upon any person," in violation of § 49:3-71(a)(3) and (4): the sham "loan," the HW2 wallet, and the name he gave Felella to book the trading under. (¶¶ 42–54, 62, 64.)

120. Cashwell knew of the untruth and the omissions and intended to deceive, within § 49:3-71(b)(1), for the reasons pleaded in paragraphs 104 through 107.

121. Cashwell is liable jointly and severally with Up Only under § 49:3-71(d), as the person who controlled the seller and as its officer and director. (¶¶ 13–14.) He cannot show that he did not know, and with reasonable care could not have known, of the facts that give rise to liability: he created them. (¶¶ 20–26, 42–54, 76–79.)

122. Defendants made the offers in this State, N.J. Stat. Ann. § 49:3-51(a)(1), because they originated here, § 49:3-51(c)(1): Cashwell directed Up Only's affairs, the solicitation, and the diversion from his home in Hopewell, New Jersey. (¶¶ 13, 15.)

123. This action is timely under section 49:3-71(g), which bars suit "more than two years after the contract of sale . . . , or more than two years after the time when the person aggrieved knew or should have known of the existence of his cause of action, whichever is later." Hamza

made his contract of sale when he executed his SAFE on November 20, 2024, within two years of this action. (¶ 34.)

124. No Plaintiff knew or should have known of its cause of action before February 2025. Until then the pitch's falsity and the "loan" plan lived only in Cashwell's private messages with Felella, and only those messages identified the "distro point" and HW2 wallets, to which the treasury's transfers ran, as Cashwell's. (¶¶ 42–54, 60–67.) Plaintiffs sue within two years of that time.

125. In the alternative, the SAFE states on its face that it has "NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 . . . OR UNDER THE SECURITIES LAWS OF CERTAIN STATES." To the extent N.J. Stat. Ann. § 49:3-60 required it to be registered, Defendants sold it unregistered, in violation of § 49:3-71(a)(1).

126. Each Plaintiff tenders its SAFE and is entitled to recover from Up Only and Cashwell, jointly and severally, the consideration it paid (¶ 110), with interest at the rate New Jersey sets for interest on judgments from the date it paid (¶ 37), and costs. N.J. Stat. Ann. § 49:3-71(c)–(d). No Plaintiff received income on the SAFE to deduct (¶ 110).

**THIRD CAUSE OF ACTION**

**(Common-Law Fraud / Fraudulent Inducement)**

**(Against Defendant Cashwell)**

127. Plaintiffs incorporate each preceding and subsequent paragraph as though fully alleged herein.

128. Under New Jersey law, common-law fraud requires a material misrepresentation of a presently existing or past fact, the defendant's knowledge or belief of its falsity, his intent that the plaintiff rely on it, the plaintiff's reasonable reliance, and resulting damages.

129. Under New Jersey's most-significant-relationship test, New Jersey law governs this claim and the Fourth and Fifth Causes of Action: New Jersey, where Cashwell lived throughout the raise and from where he directed the pitch, the diversion, and the treasury transfers, has the most significant relationship to the parties and the wrongs. (¶¶ 13–15, 76–79.) Up Only's Delaware incorporation does not displace it.

130. Cashwell made the misrepresentations pleaded in paragraphs 100 through 102, and they were false when made. (¶¶ 20–26, 40–41, 60.) As to every sale after September 27, 2024, the use-of-funds promise also misstated his then-present intent. (¶ 42.)

131. Cashwell knew they were false, for the reasons pleaded in paragraphs 104 through 107, and intended Plaintiffs to rely on them: he gave them to Felella knowing Felella would repeat them to prospective investors, and told Melnick of the handles and the development work himself, to sell the SAFE. (¶¶ 20–26, 35.)

132. Plaintiffs reasonably relied on the misrepresentations, for the reasons pleaded in paragraphs 108 and 109, and each lost what it invested. (¶ 110.)

133. Cashwell's conduct was actuated by actual malice and accompanied by a wanton and willful disregard of Plaintiffs, whom he knew it would harm. He planned to trade their capital as his own, refused to return it so he could "print some more," invented a SAFE term to keep it, threatened Felella over ZK Enpachi's demand, and the next morning moved approximately $255,600 to his HW2 wallet. (¶¶ 42, 62, 68–69, 71–79.) Plaintiffs are entitled to punitive damages.

134. Each Plaintiff is entitled to recover from Cashwell the amount it lost (¶ 110), together with punitive damages and pre-judgment interest as allowed by law.

**FOURTH CAUSE OF ACTION**

**(Conversion)**

**(Against Defendant Cashwell)**

135. Plaintiffs incorporate each preceding and subsequent paragraph as though fully alleged herein.

136. New Jersey law governs this claim, for the reasons pleaded in paragraph 129.

137. Money obtained by fraud remains the property of the defrauded payor. Cashwell obtained Plaintiffs' $275,000 by the fraud pleaded in the Third Cause of Action and acquired no right to it, so it remained Plaintiffs' property. (¶¶ 36, 130–132.) The injury is a direct one to defrauded investors, not a claim about the management of the Company.

138. Cashwell exercised dominion over that property as his own by treating it as a fund to trade for his personal account, moving it to wallets he controlled, and calling it "a loan to me, and the disposition of it is my personal perogative." (¶¶ 47–53, 64, 76–79.)

139. Cashwell did so to the exclusion of Plaintiffs' rights, refusing Felella's request to return the capital so he could "print some more" (¶ 62), refusing or ignoring every investor demand from March through July 2025, telling De Taboada in April 2025 that "a bit over 25% of the funds have been spent" (¶ 91), never answering De Taboada's formal demand of August 7, 2025, and returning nothing (¶¶ 93–94, 96).

140. The converted property is a specific, identifiable fund, traceable on the public Ethereum blockchain to the token and the block: Plaintiffs' capital, moved in identified transfers to the "distro point" wallet (0x42886cBd8080a175f758C03D74f23615510Eb52C) and the "@poppa HW2" wallet (0xB6D6831E9e7E2A16AF64D118A25B42Ac0169ce92). (¶¶ 45–46, 52–54, 76–79.)

141. No contract bars this claim because Plaintiffs sue as owners of money Cashwell took by fraud, not for performance of the SAFE. His wrong, the false pitch, came before the SAFE and breached a duty no contract created, and money obtained by fraud creates no debtor-creditor relationship. (¶¶ 20–26, 40–41.)

142. Each Plaintiff is entitled to recover from Cashwell the capital he converted from it (¶ 110), with pre-judgment interest as allowed by law, and, because the taking was actuated by actual malice for the reasons pleaded in paragraph 133, punitive damages.

## FIFTH CAUSE OF ACTION

## (Equitable Remedies: Constructive Trust, Equitable Lien, Accounting, and Disgorgement)

## (Against Defendant Cashwell)

143. Plaintiffs incorporate each preceding and subsequent paragraph as though fully alleged herein.

144. This count rests on the fraud and conversion pleaded in the Third and Fourth Causes of Action, and New Jersey law governs it (¶ 129). It arises from those wrongs, not from the SAFE, and the SAFE's choice-of-law clause does not reach it.

145. New Jersey impresses a constructive trust on property a person obtains or holds by a wrongful act, such as fraud, where keeping it would unjustly enrich him; it requires no fiduciary relationship. Cashwell obtained Plaintiffs' capital by fraud and then converted it. (¶¶ 130–132, 137–139.)

146. Cashwell kept the capital so he could "print some more" with it (¶ 62), and on November 23, 2024, weeks after the first transfers out of the treasury, he boasted of "8 figure nw growth in the past month" (¶ 58). The gains he made trading Plaintiffs' capital are the fruit of his wrong and belong in equity to Plaintiffs.

147. Plaintiffs' capital is traceable through identified transfers out of the treasury: $50,000 to the "distro point" wallet on October 2, 2024; 16,802 USDC to a third wallet on October 10, 2024, which sent 15,994 USDC on to the "distro point" wallet; 18,500 USDT to the HW2 wallet on October 30, 2024, routed that day to a KuCoin-labeled wallet; and approximately $255,600 to the HW2 wallet on February 6, 2025. (¶¶ 52–54, 76–79.)

148. Where Cashwell commingled Plaintiffs' capital, equity traces it into the resulting balance and its appreciation. He holds that capital and its traceable proceeds, his trading gains included, as constructive trustee for Plaintiffs, who are entitled to a constructive trust over them, including the "distro point" wallet, the HW2 wallet, and any account to which their contents moved, and to disgorgement of the gains through that trust.

149. Measuring the gains requires records in Cashwell's sole control. Plaintiffs are entitled to an accounting of the funds moved in the transfers pleaded in paragraph 147, the trading done with them, and the profits earned.

150. In the alternative, if Plaintiffs cannot trace their capital into a specific asset, they are entitled to an equitable lien on Cashwell's assets for the capital he took from each of them, $275,000 in all. (¶ 110.)

## SIXTH CAUSE OF ACTION

## (Unjust Enrichment—In the Alternative)

## (Against All Defendants, In the Alternative)

151. Plaintiffs incorporate each preceding and subsequent paragraph as though fully alleged herein.

152. Plaintiffs plead this count in the alternative to the First through Fifth Causes of Action, as Federal Rule of Civil Procedure 8(d)(2)–(3) permits.

153. Defendants received a benefit when Plaintiffs paid Up Only $275,000 for the SAFE and Cashwell took that capital as his own, moving it to wallets he controlled and trading it. (¶¶ 36, 47–54, 76–79.)

154. Plaintiffs conferred it expecting it to fund the Loot Labs studio and expecting the equity and tokens the SAFE promised. (¶¶ 21–26, 35.) Defendants did neither. Cashwell never built the studio, funded his own trading with the capital instead, invented a SAFE term to keep it, and never returned it. (¶¶ 47–54, 60, 62, 68–69, 96.) Keeping it would be unjust.

155. Defendants have been unjustly enriched at Plaintiffs' expense: Up Only by the $275,000 Plaintiffs paid it, and Cashwell by that capital, which he took as his own, and by the gains he made trading it. (¶¶ 110, 146, 153.) Each Plaintiff is entitled to recover from each Defendant the amount it paid (¶ 110), which each received, with one satisfaction between them, and to disgorgement of Cashwell's gains, with pre-judgment interest as allowed by law.

## SEVENTH CAUSE OF ACTION

## (Racketeering—N.J. Stat. Ann. §§ 2C:41-2(c), 2C:41-4(c))

## (Against Defendant Cashwell)

156. Plaintiffs incorporate each preceding and subsequent paragraph as though fully alleged herein.

157. New Jersey makes it "unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity." N.J. Stat. Ann. § 2C:41-2(c). Cashwell did so.

158. Up Only is an "[e]nterprise," which "includes any . . . corporation." N.J. Stat. Ann. § 2C:41-1(c). Cashwell ran it from his house in Hopewell, and it engaged in trade and commerce in New Jersey and affected trade and commerce there. (¶¶ 14–15.)

159. Cashwell, Up Only's founder, controlling shareholder, officer, and director, is a "[p]erson" employed by and associated with the enterprise. N.J. Stat. Ann. § 2C:41-1(b). (¶¶ 13–14.) He conducted and participated in the conduct of its affairs: he supplied the pitch, held a signing key to its treasury, and directed the treasury transfers pleaded in paragraphs 52, 53, and 76 through 79. (¶¶ 20–26, 45.)

160. Each sale of the SAFE to a Plaintiff was an incident of racketeering activity, committed on its own date against its own victim: Marchione and Melnick on September 26, 2024; ZK Enpachi on September 27; Fennario on October 2; De Taboada on October 3; Melnick again on October 4; Neon on October 23; and Hamza on November 20, 2024. (¶¶ 27–34, 36–38.)

161. Each sale was "fraud in the offering, sale or purchase of securities." N.J. Stat. Ann. § 2C:41-1(a)(1)(p). Knowingly and willfully, Cashwell employed a "device, scheme, or artifice to defraud" and made "untrue statement[s] of a material fact," through Felella and, to Melnick, himself, in connection with the sale, in violation of N.J. Stat. Ann. § 49:3-52(a)–(b), a crime under N.J. Stat. Ann. § 49:3-70(a), and of 15 U.S.C. §§ 78j(b), 78ff(a) and 17 C.F.R. § 240.10b-5. (¶¶ 20–26, 40–41, 100–107.)

162. Each sale was also theft by deception, racketeering activity under N.J. Stat. Ann. § 2C:41-1(a)(1)(n). Through the pitch's false statements of present fact and, after September 27, his concealed "loan" plan, Cashwell "purposely obtain[ed] property of another by deception." N.J. Stat. Ann. § 2C:20-4. (¶¶ 20–26, 40–44.)

163. Each sale was also wire fraud, racketeering activity under 18 U.S.C. § 1961(1)(B) and so under § 2C:41-1(a)(2). Having devised a scheme to defraud, Cashwell transmitted and caused to be transmitted the Telegram pitches, his raise update, the SAFE sent from coordinator@crypto.tg, and Plaintiffs' stablecoin payments into the treasury "by means of wire . . . communication in interstate or foreign commerce," for the purpose of executing that scheme. 18 U.S.C. § 1343. (¶¶ 20–26, 35, 37.)

164. Plaintiffs' payments reached the treasury Cashwell ran from New Jersey, among them De Taboada's from California and Melnick's from New York, each crossing into New Jersey from outside it. His messages of February 7, March 4 and April 23, 2025 likewise reached De Taboada in California. (¶¶ 12, 15, 37, 80–91.)

165. Cashwell is legally accountable for each statement underlying the New Jersey predicates, N.J. Stat. Ann. §§ 49:3-52, 2C:20-4, whether he spoke it or Felella, Up Only's Chief Executive Officer, spoke it. N.J. Stat. Ann. §§ 2C:1-5(b), 2C:2-6(a)–(b). Acting with the culpability each offense requires, he supplied the representations to Felella, who repeated them to investors. (¶¶ 20–26.)

166. If Felella did not know the representations were false, Cashwell caused an innocent person to make them. N.J. Stat. Ann. § 2C:2-6(b)(1). In the alternative, if Felella knew (¶¶ 43, 48, 50), Cashwell is accountable as his accomplice, having solicited and aided him in making the representations with the purpose of promoting the offenses, *id.* § 2C:2-6(b)(3), (c)(1)(a)–(b), and as one "engaged in a conspiracy with" him, *id.* § 2C:2-6(b)(4).

167. On February 6, 2025, Cashwell committed a further incident: he misapplied entrusted property, racketeering activity under N.J. Stat. Ann. § 2C:41-1(a)(1)(o). In the alternative to paragraph 137, to the extent the treasury's capital was Up Only's, Up Only entrusted it to Cashwell as its Chief Technology Officer, director and treasury signer, a fiduciary. *Id.* § 2C:20-1(b).

168. Having approved on February 1 adding his HW2 wallet as a treasury owner, Cashwell moved approximately $255,600 into it on his own two keys alone (¶¶ 70–79), and so "applie[d] or dispose[d] of property that ha[d] been entrusted to him as a fiduciary . . . in a manner which he kn[ew] [wa]s unlawful and involve[d] substantial risk of loss or detriment to the owner of the property." N.J. Stat. Ann. § 2C:21-15.

169. For the purpose of executing the scheme, Cashwell sent wires to lull investors and postpone their demands while he held their money, writing on February 7, 2025, the day after the transfer, that "for transparency i am also contributing more to the company personally"; on March 4, 2025, that Up Only had ">36 months of operational runway"; and on April 23, 2025, while

refusing De Taboada's request, that "I haven't refused anyone anything." (¶¶ 80–91, 164.) Each was wire fraud. 18 U.S.C. § 1343.

170. These incidents form a pattern because they share one purpose, obtaining investor capital by deception and keeping it for Cashwell's own use; one method; the same participants; and one class of victims, the investors in the Loot Labs raise. N.J. Stat. Ann. § 2C:41-1(d). They were not isolated: they ran from September 2024 through April 2025 and reached seven Plaintiffs in eight sales over seven dates, and other investors besides (¶ 39).

171. The violation damaged each Plaintiff in its property as the intended and direct victim of the sale that took its money: each heard the pitch, relied on it, and paid its capital into the treasury. (¶¶ 27–38, 108, 132.) Each lost what it paid. (¶ 110.)

172. Each Plaintiff "shall recover threefold any damages he sustains and the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation." N.J. Stat. Ann. § 2C:41-4(c). Trebled, the damages are: ZK Enpachi $300,000; Fennario $30,000; Neon $75,000; De Taboada $150,000; Marchione $150,000; Melnick $105,000; and Hamza $15,000, or $825,000 in all.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask the Court to enter judgment as follows:[3]

1. Against Cashwell, threefold each Plaintiff's damages under N.J. Stat. Ann. § 2C:41-4(c) (Seventh Cause of Action): ZK Enpachi $300,000; Fennario $30,000; Neon $75,000; De Taboada $150,000; Marchione $150,000; Melnick $105,000; and Hamza $15,000, or $825,000 in all, of which each Plaintiff's investment in item 3 of this Prayer is a part, not an addition;

2. Against Cashwell, a reasonable attorney's fee and the costs of investigation and litigation, under N.J. Stat. Ann. § 2C:41-4(c) (Seventh Cause of Action);

[3] Plaintiffs seek one recovery of each Plaintiff's investment: what a Plaintiff collects under item 1, 3, 5, or 9 of this Prayer, or of its principal through the trust under item 7, reduces, dollar for dollar, what Defendants owe that Plaintiff under the others. Plaintiffs seek disgorgement of Cashwell's gains once, under item 8 or item 11.

3. Against Cashwell and Up Only, jointly and severally (First and Second Causes of Action), against Cashwell (Third and Fourth Causes of Action), and, in the alternative, against each Defendant (Sixth Cause of Action), each Plaintiff's investment: ZK Enpachi $100,000; Fennario $10,000; Neon $25,000; De Taboada $50,000; Marchione $50,000; Melnick $35,000; and Hamza $5,000, or $275,000 in all;

4. Against Cashwell and Up Only, jointly and severally, interest on each Plaintiff's investment in item 3 of this Prayer from the date the Plaintiff paid it (¶ 37), at the rate New Jersey sets for interest on judgments, on the tender of its SAFE pleaded in paragraph 126, under N.J. Stat. Ann. § 49:3-71(c)–(d) (Second Cause of Action);

5. At each Plaintiff's election, in place of damages on the First and Second Causes of Action, rescission of its SAFE against Up Only, on the tender of its SAFE pleaded in paragraph 126, and the return of what it paid, owed by Up Only and Cashwell jointly and severally;

6. Against Cashwell, punitive damages (Third and Fourth Causes of Action);

7. Against Cashwell, a constructive trust over Plaintiffs' capital and everything traceable to it, including the "distro point" wallet (0x42886cBd8080a175f758C03D74f23615510Eb52C), the "@poppa HW2" wallet (0xB6D6831E9e7E2A16AF64D118A25B42Ac0169ce92), any account to which their contents were moved, and the trading gains earned with it (Fifth Cause of Action);

8. Disgorgement of those gains to Plaintiffs through that trust (Fifth Cause of Action);

9. In the alternative to that trust, an equitable lien on Cashwell's assets for $275,000, each Plaintiff's share as stated in item 3 of this Prayer (Fifth Cause of Action);

10. Against Cashwell, an accounting of the funds moved in the transfers pleaded in paragraph 147, the trading done with them, and the profits earned (Fifth Cause of Action);

11. In the alternative, against Cashwell, disgorgement of the gains he made trading Plaintiffs' capital (Sixth Cause of Action);

12. Costs of suit, against both Defendants;

13. Pre-judgment interest as allowed by law, against each Defendant on what it owes, on any amount on which item 4 of this Prayer does not run, and post-judgment interest under 28 U.S.C. § 1961; and

14. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable, under Federal Rule of Civil Procedure 38(b).

By: */s/ Brendan Herrmann*
Brendan M. Herrmann
FISHKIN LUCKS LLP
One Gateway Center, Suite 2600
Newark, NJ 07102
(973) 536-2800
bherrmann@fishkinlucks.com

Patrick N. Andriola (*pro hac vice forthcoming*)
233 Broadway, Suite 1710
New York, NY 10279
646-755-9200
pandriola@fishkinlucks.com

Brandon Orewyler (*pro hac vice forthcoming*)
ASTRAEA COUNSEL APC
9171 Wilshire Blvd, Suite 500 PMB 9062
Beverly Hills, CA 90210
(310) 910-1390
brandon@astraea.law

*Attorneys for Plaintiffs*